**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 17-4**

LESLEY EUGENE WARREN,

                    Petitioner – Appellant,

       v.

EDWARD THOMAS, Warden,

                    Respondent – Appellee.

Appeal from the United States District Court for the Middle District of North Carolina, at Greensboro.  Catherine C. Eagles, District Judge.  (1:05-cv-00260-CCE-JEP)

Argued:  May 10, 2018                                 Decided:  July 10, 2018

Before NIEMEYER, KEENAN, and HARRIS, Circuit Judges.

Affirmed by published opinion.  Judge Harris wrote the opinion, in which Judge Niemeyer and Judge Keenan joined.

**ARGUED:**  Kristin Davis Parks, LAW OFFICE OF KRISTIN PARKS, Chapel Hill, North Carolina, for Appellant.  Jess D. Mekeel, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellee.  **ON BRIEF:**  Jonathan E. Broun, Elizabeth G. Simpson, NORTH CAROLINA PRISONER LEGAL SERVICES, INC., Raleigh, North Carolina, for Appellant.  Joshua H. Stein, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF NORTH CAROLINA, Raleigh, North Carolina, for Appellee.

PAMELA HARRIS, Circuit Judge:

A North Carolina jury convicted Lesley Eugene Warren of the first-degree murder of Katherine Johnson. The government sought the death penalty, and at the sentencing phase it introduced evidence that Warren recently had been convicted of murdering two other women. Because of the death sentence he received for one of those convictions, Warren could not be paroled if sentenced to life for the murder of Johnson, and asked the trial court to so instruct the jury. The court declined to give the instruction, and the jury sentenced Warren to death.

Under *Simmons v. South Carolina*, 512 U.S. 154 (1994), a defendant is entitled to inform the jury when the alternative to a death sentence is life in prison without parole, but only if the prosecutor puts at issue the risk that he will be a danger to society if released from prison. The Supreme Court of North Carolina rejected Warren's *Simmons* claim, holding that the prosecutor in his case had not argued future dangerousness in support of the death penalty, and the district court denied Warren's petition for relief under 28 U.S.C. § 2254. Because the Supreme Court of North Carolina reasonably applied *Simmons* to Warren's sentencing, we affirm.

## I.

### A.

On July 15, 1990, Warren met Katherine Johnson, a 21-year-old college student, at a picnic he was attending with a friend in High Point, North Carolina. Warren and Johnson spent the rest of the day together, first with a group that included Warren's

2

friend and later by themselves. That night, Warren and Johnson went for a ride on Warren's motorcycle, ending up in the middle of a soccer field. There, Warren choked Johnson to death. After hiding Johnson's body in the trunk of her car and abandoning the car in a parking garage, Warren returned to his friend's house and went to sleep on the couch.

Five days later, police arrested Warren on a South Carolina warrant for the murder of a woman named Velma Gray. When questioned, Warren confessed to killing Gray in South Carolina in 1989. He also confessed to killing Jayme Hurley in North Carolina in May 1990. And finally, he confessed to killing his third victim, Katherine Johnson, just days earlier.

In 1996, Warren was tried and convicted of the first-degree murder of Katherine Johnson. By then, he already had been convicted in South Carolina of the first-degree murder of Velma Gray, for which he received a life sentence. He also had pled guilty to the first-degree murder of Jayme Hurley in North Carolina, for which he was sentenced to death. That death sentence meant that under North Carolina law, Warren could not be paroled if sentenced to life for the murder of Katherine Johnson.

**B.**

At the sentencing phase of Warren's trial, the government sought the death penalty based on a single aggravating factor: that Warren previously had been convicted of another capital felony, *see* N.C. Gen. Stat. § 15A-2000(e)(2) (1995), in the form of his two prior murder convictions. As a result, that Warren had killed not just one but three women became a focal point of the prosecutor's lengthy closing argument for the death

3

penalty. Using the horrific details of all three murders, along with evidence from the guilt phase of trial, the prosecutor argued that Warren deserved a death sentence.

Because Warren's *Simmons* claim turns on the prosecutor's closing argument, we describe it in some detail. The prosecutor began by describing the "depravity" of each of Warren's three murders, J.A. 1735, which he attributed to choices made by Warren: "He could have chosen life. But instead, in all three instances, he chose death," J.A. 1733 – and not just any death, but death by slow strangulation, for "no reason" at all, J.A. 1734– 35. Warren killed because he liked it, the prosecutor argued, and he felt no remorse.

Then, in a portion of the argument on which Warren focuses for his *Simmons* claim, the prosecutor invoked the testimony of a psychologist, retained by the defense, who had prepared a social history on Warren. The defense's own witness, the prosecutor argued, described Warren as having a "habit" of killing women, doing it "over and over and over." J.A. 1740. He noted a "pattern" in Warren's behavior, consistently hiding the evidence of his crimes – his victims' bodies – "[i]n the water, in a grave, in a car." J.A. 1741. "What will stop him?," the prosecutor asked, before repeating, "Over and over and over." J.A. 1740.

The prosecutor explained to the jury the aggravating factor on which the government was relying – that Warren previously had been convicted of a capital felony – and offered the first-degree murders of Hurley and Gray as support. The government had introduced detailed evidence of those murders, the prosecutor said, so that the jury could do a "character analysis" of the defendant, to "see whether or not [Warren] deserves to die for what he did." J.A. 1745. The answer, the prosecutor urged, was yes,

4

addressing the defense's mitigating evidence and arguing it was insufficient to reduce Warren's moral culpability for his crimes.

Near the end of his argument – in the other portion on which Warren primarily relies – the prosecutor acknowledged that "[t]he Bible tells us, you know, to turn the other cheek, that . . . we should always give people a second chance." J.A. 1760–61. But Warren, he argued, already had been given a second chance, and "chose not to use" it; instead, after murdering Velma Gray, Warren continued to kill. J.A. 1761. "How many more chances do we have to give him?," the prosecutor asked the jury. *Id.* "One, two, three." *Id.* Warren, the prosecutor insisted, "is addicted to killing women." *Id.*

The prosecutor concluded by talking again about the three women Warren had murdered, and showing Johnson's picture to the jury. He told the jury that while it could not bring peace to the victims, it could restore their "dignity." J.A. 1764. To do "justice" for the victims and the community, the prosecutor finished, the jury should recommend death. J.A. 1765.

In an effort to persuade the jury to recommend a life sentence, Warren's lawyers argued numerous mitigating factors. Warren's moral culpability, they contended, was substantially reduced, primarily by abuse during his childhood and serious mental and emotional disturbances in his youth and teenage years. The jury ultimately recommended a sentence of death.

## C.

Warren raised numerous issues on direct appeal of his conviction and death sentence. Among them was a claim that the trial court violated the constitutional rule set

out in *Simmons* when it refused to instruct the jury on his parole ineligibility.  The Supreme Court of North Carolina rejected that claim on the merits.  *Simmons*, the court explained, applies only where the government argues for the death penalty on the ground that the defendant will pose a future danger to society; under those circumstances, it violates due process to conceal from the jury that the defendant in fact will be confined to prison for life, without the chance of parole.  But here, the court concluded, the government had not based its plea for the death penalty on any threat of future danger to the community:  "We have reviewed the prosecutor's argument that [the] defendant contends entitles him to relief, and in our view the prosecutor did not argue future dangerousness."  *State v. Warren*, 499 S.E.2d 431, 455 (N.C. 1998).  Instead, the court found, the prosecutor argued that the "defendant was a serial killer deserving of the death penalty," based on the evidence of his three murders.  *Id.*

In 2005, Warren filed a habeas petition in federal district court under 28 U.S.C. § 2254.  Warren identified 18 claims, including the *Simmons* issue.  The district court granted Warren's motion to hold the case in abeyance pending resolution of his state habeas challenge to his other North Carolina conviction, for the first-degree murder of Jayme Hurley.  Ten years later, the district court lifted the stay, rejected all of Warren's claims, and denied his habeas petition.

Because the state supreme court had denied Warren's *Simmons* claim on the merits, the district court explained, Warren was entitled to relief only if that decision was an "unreasonable application of[] clearly established [f]ederal law," or "based on an unreasonable determination of the facts."  J.A. 2128 (quoting 28 U.S.C. § 2254(d)).

6

After a careful review of the prosecutor's closing argument, the district court concluded that Warren could not meet that standard:  "The interpretation of the . . . Supreme Court [of North Carolina] that the prosecutor did not argue future dangerousness was not unreasonable based on a reading of the entire closing argument."  *Id.*

The statements identified by Warren, the district court found, "constitute only a few words and phrases in an extensive closing argument that was focused on Mr. Warren's *past* acts and status as a serial killer."  J.A. 2129 (emphasis added).  First, there was the description of Warren's "habit" of killing women (and later the reference to Warren as "addicted" to killing), coupled with the question, "What will stop him?"  J.A. 2126–27.  "Read in context," the court concluded, it was not unreasonable to view those statements, which came "at the end of a lengthy description of [Warren's] murders," as emphasizing that Warren was a serial killer who was not stopped until he had killed three times.  J.A. 2127.  Similarly, the reference to second chances, questioning "[h]ow many more chances do we have to give him?," reasonably was understood, in context, as "rhetorical emphasis on the three murders Mr. Warren had committed:  his three chances."  J.A. 2127–28.  The focus of the prosecutor's argument, the court concluded, was Warren's prior actions "in committing the three murders of which he was convicted" as a "cowardly serial killer," with the death penalty the "only way for the three murdered women to achieve some sense of justice and dignity."  J.A. 2126–27.

Warren timely appealed the district court's dismissal of his habeas petition.  We granted a certificate of appealability limited to the *Simmons* claim.

## II.

We review the district court's denial of a habeas petition de novo. *Teleguz v. Pearson*, 689 F.3d 322, 327 (4th Cir. 2012). But our analysis is circumscribed by the amendments to 28 U.S.C. § 2254 enacted in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Under AEDPA, we may not grant relief on a claim adjudicated on the merits in a state court proceeding unless, as relevant here, the state court's determination is "contrary to, or involved an unreasonable application of, clearly established [f]ederal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

That is a high bar. To be an "unreasonable application" of Supreme Court precedent, the state court's decision must be "objectively unreasonable, not merely wrong; even clear error will not suffice." *White v. Woodall*, 134 S. Ct. 1697, 1702 (2014) (internal quotation marks omitted). We agree with the district court that the Supreme Court of North Carolina did not unreasonably apply *Simmons*, and we therefore affirm.

It is well established that in seeking the death penalty, the government may rely on the "possibility that the defendant may be returned to society" and the risk that his "probable future behavior" then would pose to the community. *California v. Ramos*, 463 U.S. 992, 1003 (1983). *Simmons* does not change that rule. *See Simmons*, 512 U.S. at 163 (recognizing that prosecutors frequently "urge the jury to sentence the defendant to death so that he will not be a danger to the public if released from prison"). Instead, it establishes a defendant's due process right, when confronted with that argument, to inform the jury if in fact he is legally ineligible for parole, "as a means of responding to

8

the State's showing of future dangerousness." *Id.* at 177 (O'Connor, J., concurring); *see Richmond v. Polk*, 375 F.3d 309, 331 (4th Cir. 2004) (recognizing Justice O'Connor's concurrence as the controlling opinion in *Simmons*).

In *Simmons*, the Court confronted a case in which the prosecutor argued to the jury that its role was "to decide what to do with [the defendant] now that he is in our midst," and told the jury: "Your verdict should be a response of society to someone who is a threat. Your verdict will be an act of self-defense." 512 U.S. at 176 (internal quotation marks omitted). That was enough, the Court held, to "strongly impl[y] that [the defendant] *would* be let out eventually if the jury did not recommend a death sentence." *Id.* at 178 (emphasis in original). And once the prosecutor had "put petitioner's future dangerousness in issue" in this way, due process entitled the defendant to respond by "inform[ing] the capital sentencing jury – by either argument or instruction – that he is parole ineligible." *Id.* at 177–78; *see also Kelly v. South Carolina*, 534 U.S. 246, 255 (2002) (finding that prosecutor implied defendant would be released from prison for *Simmons* purposes when he expressed his hope that jurors would "never in [their] lives again have to experience . . . being some thirty feet away from such a person as [defendant]" (internal quotation marks omitted)).[1]

---

[1] Because the decision in *Kelly v. South Carolina*, 534 U.S. 246 (2002), came after the state court's 1998 decision in this case, it is relevant to our analysis under AEDPA only to the extent it is "illustrative" of the rule laid out in *Simmons*. *See Frazer v. South Carolina*, 430 F.3d 696, 716 (4th Cir. 2005) (Motz, J., concurring); *see also Wiggins v. Smith*, 539 U.S. 510, 522 (2003). To the extent *Kelly* expands the contours of the right established in *Simmons* – an issue on which we express no opinion – we cannot (and do not) consider it.

This case, the Supreme Court of North Carolina held, is different. Here, according to the state court, the prosecutor did not argue "future dangerousness" in support of the death penalty, as contemplated by *Simmons*, so Warren had no due process right to respond with information about his parole ineligibility. *Warren*, 499 S.E.2d at 455. And because *Simmons* was not implicated, the state was entitled to apply its own rule that "evidence regarding parole eligibility is not a relevant consideration in a capital sentencing proceeding." *Id.*; *see Simmons*, 512 U.S. at 176–77 (explaining that "if the prosecution does not argue future dangerousness," then "the State may appropriately decide that parole is not a proper issue for the jury's consideration"). Like the district court, we think the determination that the prosecutor did not put at issue Warren's "future dangerousness" constitutes a reasonable application of *Simmons*.

As the district court explained, the prosecutor's argument, read in full, reasonably can be understood as essentially backward-looking. In support of the death penalty, that is, the prosecutor relied not on the risk that Warren might in the *future* be released from prison and endanger the community, but rather on what Warren already had done in the *past* – namely, his actions and state of mind in committing the three murders of which he was convicted. *See* J.A. 2129 (describing prosecutor's argument as "focused on Mr. Warren's past acts and status as a serial killer"). That those murder convictions reveal Warren to be a person fairly described as "dangerous" does not by itself trigger *Simmons*, or virtually all capital proceedings would be governed by that decision. *Cf. Simmons*, 512 U.S. at 176 (reaffirming that decision whether to inform jury of possibility of parole remains "generally left to the States"). What matters is whether the prosecutor urged the

10

jury to look forward, to the possibility that the defendant eventually would be released from prison if not sentenced to death and hence become a danger to the community. *Id.* at 177–78.

The Supreme Court of North Carolina reasonably applied *Simmons* in concluding that Warren's prosecutor did not advance this "future dangerousness" argument. Taken in context, the portions of the argument cited by Warren – "a few words and phrases in an extensive closing argument," J.A. 2129 – may sensibly be read as commenting on Warren's past crimes and character, rather than any prospect of his release from prison. The question, "What will stop [the defendant]?," cited throughout Warren's briefs on appeal, is paired with a description of Warren's past crimes as especially depraved and of Warren as a sociopath without a conscience. J.A. 1740–41. Against that backdrop, the prosecutor reasonably may be understood as using his question – along with his references to Warren's "habit" of killing women or his "addict[ion] to killing," J.A. 1740, 1761–62 – to emphasize that Warren was a remorseless "serial killer" who was not stopped until he had committed three murders. *Warren*, 449 S.E.2d at 455; *see* J.A. 2127. Similarly, when the prosecutor asks, "How many chances do we have to give [Warren]?," it is in discussing Warren's past failure to avail himself of earlier "chances" not to commit murder: "Well, you know, he had a second chance, and he chose not to use that second chance. You know, he killed Velma Gray right here." J.A. 1761. It is reasonable to read those comments as alluding not to society's need to defend itself against Warren's possible future release from prison, *cf. Simmons*, 512 U.S. at 178, but instead to Warren's

11

moral reprehensibility and deservedness of the death penalty. *See Warren*, 449 S.E.2d at 455.

In sum, it is not unreasonable to find that these statements, taken separately or together, are different in kind from those in *Simmons* – statements that "put [Simmons's] future dangerousness in issue" by "strongly impl[ying]" that Simmons would "be let out [of prison] eventually if the jury did not recommend a death sentence" and would pose a "continuing threat to the community," and linking that future threat to the jury's need to return a verdict in "self-defense." *Simmons*, 512 U.S. at 176, 178. Like the district court, we are mindful that our review under AEDPA is highly deferential, and that relief may be granted only if a state court adjudication is "objectively unreasonable." *See White*, 134 S. Ct. at 1702. The Supreme Court of North Carolina's holding that Warren's prosecutor did not argue "future dangerousness" under *Simmons* falls well within the bounds of reasonableness.[2]

## III.

For the foregoing reasons, we affirm the judgment of the district court.

*AFFIRMED*

---

[2] In light of this holding, we need not reach the government's alternative arguments against application of *Simmons* to this case. Accordingly, we express no view as to the government's contention that Warren was not parole ineligible within the meaning of *Simmons* because his ineligibility was a function of his separate death sentence for the murder of Jayme Hurley, rather than the sentencing options before the jury in the instant case. Nor need we consider whether, as the government urges, any *Simmons* error in Warren's sentencing could have been deemed harmless under *Brecht v. Abrahamson*, 507 U.S. 619 (1993).